No. 79-74

IN THE SUPREME COURT OF THE STATE OF MONTANA

1980

STATE OF MONTANA,

Plaintiff and Respondent,

vs.

JOHN L. PRICE,

Defendant and Appellant.

Appeal from: District Court of the Eighteenth Judicial District,
In and For the County of Gallatin,
Honorable Joseph Gary, Judge presiding.

Counsel of Record:

For Appellant:

Goetz and Madden, Bozeman, Montana
James Goetz argued, Bozeman, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
John H. Maynard argued, Assistant Attorney General,
Helena, Montana
Donald E. White, County Attorney, Bozeman, Montana
Michael J. Lilly argued, Deputy County Attorney,
Bozeman, Montana

Submitted: March 24, 1980

Decided: DEC 17 1980

Filed: DEC 17 1980

Thomas J. Kearney
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Defendant John L. Price appeals from a judgment of the Gallatin County District Court, entered after a nonjury trial, convicting him of two felony counts of sexual assault and one misdemeanor count of obscenity.

In attacking the sexual assault convictions, defendant asserts insufficiency of the evidence to sustain these convictions, but also contends that assuming the sufficiency of the evidence, the case must be reversed because the trial court did not set forth the legal standard of consent whereby it determined that the sexual touching was without the boy's consent. Defendant also argues that his convictions of sexual assault must be reversed because testimony of a psychiatrist concerning defendant's admissions to the sexual touchings constituted a violation of the patient-physician privilege. In attacking the misdemeanor obscenity conviction, defendant contends that the State failed to comply with section 45-8-201, MCA, in that the State failed to admit evidence at trial which would give the trial court a basis upon which to determine contemporary community standards and whether the conduct appealed to a prurient interest in sex. His last contention is that he was denied due process of law at the sentencing hearing because the State surprised him with the testimony of two women who stated that at least 11 years before, while they were young girls, the defendant touched them in a sexual manner.

We conclude that the evidence is sufficient to uphold both convictions of sexual assault. We reverse and dismiss the misdemeanor conviction of obscenity because the State failed to introduce evidence of contemporary community standards, or evidence that the conduct involved appealed to a prurient interest in sex. This requirement is a statutory one in this state, and the failure of the State to meet this

requirement left the trial judge without an evidentiary basis to determine this issue.

The question as to the admissibility of the psychiatrist's testimony is one that defendant cannot really complain about in this appeal, because he first sought and obtained admission of medical reports containing defendant's admissions that he touched the boy. Defendant did not, furthermore, object to the admission of this testimony at trial, and thus, he has waived his right to predicate error upon its admission.

The criminal charges involved arose out of incidents which took place in a swimming pool at Bozeman Hot Springs. The Hot Springs is a privately owned and operated camping and recreation resort. The complex includes a public indoor hot springs mineral swimming pool. Swimmers are required to wear proper swimsuits and remain properly covered. The incidents took place in November and December 1978, while Chris, a ten-year-old boy, and his nine-year-old sister, Nicole, were staying with their parents at the KOA Campground, which is adjacent to the Hot Springs. Chris and Nicole frequently played on the grounds surrounding the Hot Springs and regularly swam in the pool.

The first incident which later gave rise to a charge of sexual assault and a charge of obscenity took place at the swimming pool in November 1978. While Chris and Nicole were swimming, they noticed the defendant, a 65-year-old man, exposing himself. The defendant then approached Chris and struck up a conversation. While doing so he placed his hand down the front of Chris's swimsuit and touched the boy's private parts. Chris was angered and moved away from the defendant. Nicole observed this incident.

The next incident, but one which did not lead to a criminal charge, took place on December 11, 1978, when

Chris, Nicole and their little brother were riding bicycles around the Hot Springs complex, when they noticed the defendant in his car. He asked the children to go to his car and listen to music, but they declined. While the children were leaving, however, the defendant again touched Chris on the outside of his clothing in the genital area. Chris rode his bicycle home and reported the incident to his mother. His parents notified law enforcement officials.

The last incident, which led to another charge of sexual assault, took place on December 17, 1978, when Chris, at the suggestion of law enforcement officials, was used to lure the defendant into another act of sexual touching. The deputies, with the consent of the parents, asked Chris to go to the Hot Springs pool and instructed him how to conduct himself at the pool. Chris was specifically instructed "not to go towards the defendant or say anything to him, beckon to him or call to him."

Chris then went into the swimming pool and the deputies went to prearranged observation stations at the pool. While Chris was swimming, the defendant came over to him and started a conversation. Chris continued to swim. Moments later, while Chris was upside down in the pool walking on his hands, the defendant grabbed Chris's legs and set him rightside up. Defendant then placed his hand down in front of Chris's swimsuit and touched his private parts. Chris was angered and moved away. Chris then saw his father standing along the pool, and he immediately got out of the pool.

As a result of these episodes, defendant was charged with two counts of sexual assault and one count of obscenity. During the trial, the psychiatrist who had examined the

-4-

defendant testified that defendant had admitted to him that he had touched the boy in a sexual way. Defense counsel did not object to this testimony. The prosecution also introduced into evidence, without objection from defendant, a report from the same psychiatrist which contained statements by the defendant that he had touched the boy in a sexual way. The defendant did not testify.

On September 13, 1979, the trial court entered its findings, conclusions and judgment and found defendant guilty of all three charges. The court also ordered a presentence investigation and report and set the sentencing for September 24, 1979. Defendant was sentenced to six months in the county jail for obscenity and he was sentenced to ten years in the Montana State Prison on each of the two felony counts of sexual assault, with six years suspended on each count. The sentences were to run concurrently. The trial court also ruled that defendant was a nondangerous offender. This appeal followed.

THE CONSENT ISSUE

With relation to defendant's argument that the State failed to prove the boy did not consent to the sexual touching, we must preface our analysis with a brief statement of the existing statutory law applying to the issue of consent where the charge is sexual assault. Defendant was convicted of violating section 45-5-502, MCA. Neither this statute nor any other applicable statute, provided that consent is ineffective if the victim is under a certain age. (Although not applicable here, this statute has since been amended to provide that consent cannot be given if the victim is less than 14 years old. See section 45-5-502(5), MCA.) Because of this legislative omission, defendant contends that the State must prove lack of consent regardless of the age of the victim.

We are faced with two anomalies. First, we must analyze the evidence to determine whether the evidence was sufficient to establish that the boy did not consent to the sexual touching. Obviously, if the evidence was insufficient, the trial court's decision must be reversed and the charges ordered dismissed. Assuming that the evidence is sufficient (and we so find), we are confronted by a bare bones set of findings and conclusions, from which it is not apparent the precise legal basis upon which the trial court decided the issue of consent. The defendant argues that the failure to set forth in the conclusions, the legal theory upon which the consent was found, necessitates a reversal.

First, to an analysis of the evidence. The consent issue is raised here because the State failed to ask a direct question of the boy--as to whether he consented to the contacts. Our job here, however, is first to determine whether there is sufficient evidence in the record from which the trial court could determine that the boy did not consent, even though the legal basis for such conclusion was not set forth.

After the first sexual touching in November 1978, the boy was angered and moved away from the defendant. The boy testified that after this incident, he stayed away from the Hot Springs swimming pool because he did not wish to be near the defendant. Another sexual touching occurred when the defendant asked the young boy and his sister and brother to get into the car with him and listen to music. Indeed, it was this sexual touching which prompted the boy to tell his parents. The third sexual touching took place in a situation where the boy was instructed to get in the swimming pool, and where the conduct of the defendant and the boy was

observed.  The boy was specifically instructed not to do anything to entice the defendant towards him.  The record is barren of any evidence that the boy enticed the defendant to be near him or that when he did come near, that he consented to any touching at all.  Indeed, the boy was walking on his hands in the swimming pool when the defendant grabbed him and turned him rightside up.  Almost immediately, the defendant then shoved his hand inside the boy's swimming trunks and touched him.  The boy pulled away in anger and got out of the defendant's reach.  This episode was observed by two police officers who were stationed there to specifically observe the conduct, primarily of the defendant, but also that of the boy.

Defendant contends that this evidence fails to lay a basis for a legally sufficient conclusion that the boy did not consent to the sexual touching on each of the occasions involved.  Defendant contends that only direct evidence from the mouth of the boy that he did not consent could establish that he did not consent to the sexual touchings.  But this argument ignores the reality of a small boy being confronted by an adult under embarrassing circumstances.  Undoubtedly, the consent issue would have presented a cleaner case if the boy had uttered the magic words in front of the trial judge that he did not consent to the sexual touchings, but this failure does not render the evidence insufficient.  There is absolutely nothing in the record to indicate that the boy permitted the sexual touchings to occur.  Indeed, as is so often the case in situations such as this, the events took place so fast that there was hardly time for a young boy (or anyone, for that matter) to have advance warning of what was about to take place.  On both occasions involved, the boy

-7-

was angered and moved away from the defendant. This hardly demonstrates that the boy approved of such conduct. The fact that the boy reported an intervening incident to his parent is indicative, albeit circumstantially, of a lack of consent. The failure of the boy to utter the magic words does not *ipso facto* establish the insufficiency of the evidence.

Our task here, however, does not end with a holding that the evidence is sufficient for sustaining a finding of guilt. We are left with a sufficient evidentiary record and with no precise basis of determining how the trial court reached its decision.

The sexual assault statute, which contains the consent requirement at issue here, section 45-5-502(1), MCA, reads as follows:

> "A person who knowingly subjects another not his spouse to any sexual contact without consent commits the offense of sexual assault." (Emphasis added.)

It is clear that one of the elements the State must prove is that the sexual touching took place "without consent" of the victim. It is equally clear that every element of a crime must be proved beyond a reasonable doubt. In re Winship (1970), 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368.

At the conclusion of the trial, defendant moved the trial court to dismiss the assault charges or to grant a directed verdict on the ground that the State failed to prove lack of consent to the sexual touching. The State asked the trial court to open up the trial to permit additional evidence on the consent issue. The trial court took this motion under advisement and ultimately denied it. Briefs were then filed by both sides on the issue of consent. The State defended the consent issue on three grounds: First,

-8-

that circumstantial evidence was sufficient to reach a conclusion that the State proved lack of consent; second, that sections 45-5-501 and 45-5-503, MCA, which provide that a victim under the age of 16 is incapable of consenting to an act of sexual intercourse, should also apply to the sexual assault charges filed under section 45-5-502; and third, that general definitional and case law dictate an application of the common law rule that someone 10 years old or younger is incapable of legally consenting to anything.

In this appeal, the State concedes the inapplicability of either of its arguments with relation to inability to consent as a matter of law. The State thus concentrates on its first approach: that the circumstantial evidence existing is sufficient to prove the lack of consent. We agree with this assessment. However, the findings and conclusions entered by the trial court do not tell us on what legal basis the trial court determined the issue of consent. Did the trial court determine as a matter of evidence only that the State had proved lack of consent? Or did the trial court determine that the young boy was, as a matter of law, incapable of giving consent by either of the two theories advanced by the State?

With relation to the first charge of sexual assault, the pertinent finding (No. 9) provides:

> "The old man also asked Chris if he liked hot water. Christopher replied that he did. The old man then asked him 'Does it give you a hard on?' Chris said, 'What?' and then the old man stuck his hand down Chris' swimming suit and felt his 'privates'. <u>Chris pulled away from the old man and felt mad.</u>" (Emphasis added.)

The conclusion of law with relation to the issue of consent (No. 6) states:

"That on or about the 19th day of November, 1978, the defendant, John L. Price, age 65, subjected Chris, a child of ten, not his spouse, to sexual contact without consent." (Emphasis added.)

The findings and conclusions with relation to the second assault charge similarly fail to reveal the legal basis upon which the consent issue was decided. The pertinent finding (No. 13) provides:

"Gallatin County Sheriff's deputies Pearson, Brown and Schumacher, took up various vantage points around the pool. Deputy Schumacher was stationed in the ceiling above the pool and could observe all that occurred therein. He saw a white haired old man with a white beard approaching Chris, who attempted to get away. The old man eventually caught up with Chris and picked him up by his feet and let him down and then approached Chris and appeared to thrust his hand down into Chris' swimming suit. Chris pulled away and then immediately got out of the pool. Chris stated that the old white haired man had put his hand into his swimming suit and felt his 'private'. The old man also asked, as he put his hand into Chris' pants, if Chris wanted to get a hard on. Chris felt mad after this happened." (Emphasis added.)

The conclusion of law with relation to this same event in relation to the consent issue (No. 9) provides:

"That on or about the 17th day of December, 1978, the defendant, John L. Price, age 65, subjected Chris, a child aged ten, not his spouse, to sexual contact without consent." (Emphasis added.)

As we have already stated, lack of consent could be proved by circumstantial evidence, and there was sufficient evidence to support a determination of lack of consent. In this situation, there are well-established rules of appellate law which apply to sustain the judgment of conviction entered by the Court on the counts of sexual assault. In State v. Duncan (1979), ___Mont.___, 593 P.2d 1026, 1034, 36 St.Rep. 748, 758, we said a District Court in a criminal bench trial was under no statutory duty, except in death penalty cases (section 46-18-306, MCA), to make findings, but was merely

-10-

obliged to enter a general verdict of innocence or guilt. Error of the District Court is not presumed, State v. Boe (1963), 143 Mont. 141, 388 P.2d 372; indeed every presumption is in favor of a judgment of conviction on appeal if any substantial evidence supports it. State v. Stoddard (1966), 147 Mont. 402, 412 P.2d 827.

The conclusions of law reached by the District Court could be construed to mean that the court found lack of the victim's consent from his incapacity as a 10-year-old to consent, or that in any event the boy did not consent. Conclusions of law reached by a trial court do not enjoy the same level of inviolability that findings of fact are accorded on appeal (see e.g., Rule 52(a), M.R.Civ.P.). This Court is in at least an equal position with the District Court to determine the appropriate conclusion of law to be reached from the facts found in a case. Since we have found that there was sufficient evidence adduced to support a con- clusion that the boy did not in fact consent to defendant's unlawful acts, all the presumptions are in favor of the judgment of conviction, as we have shown. We, therefore, sustain the conviction on the sexual assault counts.

THE OBSCENITY ISSUE

We have already set forth the facts leading to the obscenity conviction--in essence, that the defendant in November 1978, exposed his sexual organs to the young boy and his sister while they were at the Bozeman Hot Springs swimming pool. As a result of this exposure, defendant was charged with and convicted of obscenity under section 45-8- 201, MCA. Defendant acknowledges that the exposure was sufficient to subject him to a charge of indecent exposure, but argues that the State chose instead to charge him with obscenity, and thus, must prove each of the requirements

-11-

under the obscenity statute. He argues that the obscenity
conviction cannot be sustained because the State did not
establish at trial, as an evidentiary proposition, that
based on contemporary community standards, the conduct
involved appealed to the prurient interest in sex. See
section 45-8-201(2)(a) and (b), MCA. The State acknowledges
that it presented no evidence on this question, but argues
that it is not required to establish an evidentiary foundation
with regard to contemporary community standards and the
appeal to a prurient interest in sex.

In arguing that it need not present trial evidence with
regard to contemporary community standards, appeal to
prurient interest or patent offensiveness, the State relies
on Kaplan v. California (1973), 413 U.S. 115, 93 S.Ct. 2680,
37 L.Ed.2d 492, which seemingly holds that all that is
required is for the alleged obscene material to be introduced
into evidence and a subsequent jury verdict stamping the
material as obscene. Whatever the holding in Kaplan,
however, we cannot consider it as controlling the issue
here.

The first reason that Kaplan is not controlling is that
this state has enacted specific legislation setting forth
the elements which must be proved for an obscenity conviction.
Section 45-8-201(b), MCA, requires that the conduct involved
must appeal to the prurient interest in sex, and requires
that this standard must be determined by contemporary com-
munity standards. Nowhere does this statute permit the
trier of fact to make these determinations without an evidentiary
basis in the trial record. This being the case, the findings
and conclusions of the trial court, absent the required
evidentiary basis, cannot be upheld.

-12-

We concede that the portion of the obscenity statute that requires proof of contemporary community standard refers to "material", and that the obscenity statute could be stretched to mean that community standards do not apply to exposure crimes, since "material" is not involved. This defendant undoubtedly committed a crime of indecent exposure, but was charged under the obscenity statute. That statute is imprecise when applied to this crime, because the obscenity statute was fashioned to meet First Amendment implications in obscenity cases. So this Court comes again to a situation where a conviction must be set aside for lack of proof of the crime charged.

This Court has received some criticism because we have reversed convictions in cases such as this. Generally, we have refrained from adverse comment in our decisions, because judicial opinions are not meant to be instruments of public relations. Here, we will offer only this plain advice: charge a flasher as a flasher and not as a strip-tease artist.

The obscenity conviction must be reversed and dismissed.

THE SENTENCING ISSUE

About five minutes before the sentencing hearing was to begin, the State notified defendant that it would call two female witnesses to testify that some 11 years before, the defendant had touched them in a sexual manner very similar to this case. Defendant objected to this testimony, but the objection was overruled. Defendant did not, however, ask for a continuance. The court admitted the testimony but did not refer to it in any manner in its sentencing judgment.

One woman, 21 years old, testified that the defendant exposed himself to her during the summer of 1968, when she was 11 years old. She also testified that during this same summer

-13-

the defendant touched her sexually--the ostensible justification for the touching being her complaint that her legs were sore after a day of horseback riding. Finally, she testified that during this summer she frequently saw the defendant expose himself at the swimming pool by dropping his swimming trunks. She could not specify the dates on which these activities allegedly took place nor was her testimony corroborated in any manner.

The other woman, 24 years old, testified that during the summer of 1966, when she was 10 years old, she was sitting on the defendant's lap after riding horses, and the defendant caressed her sexually. Like the first witness, she could not establish the dates or times when this happened, and neither was her testimony corroborated in any manner.

Defendant contends that this surprise testimony deprived him of any meaningful opportunity to refute the charges. He argues, furthermore, that the testimony as to the events so remote in time had the effect of depriving defendant of meaningfully rebutting the testimony. The State, on the other hand, admits that it planned to surprise defendant by this testimony at the sentencing hearing. Answering the defendant's remoteness argument, the State argues that the evidence was relevant in all events because a sentencing court should have before it all available evidence concerning a defendant's past. Next, the State argues that failure to give advance notice of this testimony was sufficiently ameliorated because defendant had an opportunity to cross-examine both witnesses. Finally, the State urges that defendant is in no position to press this point on appeal because he waived such right by failing to ask for a continuance of the sentencing hearing in order to better meet the evidence offered.

-14-

Because of the State's denial of a reasonable notice to defendant, any contention of the State that defendant waived his right to complain because he did not request a continuance, falls on deaf ears. To hold otherwise would reward the State for its failure to comply with one of the pillars of due process of law, fair notice. For this reason alone, we are compelled to order resentencing.

Now that the defendant has notice, he will at the time of resentencing in the case have the opportunity to provide rebuttal evidence on the prior crimes if such evidence is admitted. The question of admissibility of such evidence as having a bearing on the sentencing, and as to whether it is remote and uncorroborated, remains one for the reasonable discretion of the trial court. The defendant's character, background, history, and mental and physical condition are proper subjects for the District Court to consider in determining a proper sentence. Section 46-18-101, MCA. As far as the record now shows, although the trial court admitted this evidence at the sentencing hearing, it was not alluded to as a factor in the sentence received by the defendant.

The convictions of sexual assault are affirmed. The cause is remanded for a new sentencing hearing on those convictions. The conviction of obscenity is reversed and the cause ordered dismissed.

_____
                    Justice

We Concur:

_____
        Chief Justice

_____

_____
            Justices

Mr. Justice Daniel J. Shea will file a written dissent later.

-15-

DISSENT

No. 79-74

State v. Price

---------------------------------------------------------------

Authored by Mr. Justice Daniel J. Shea

---------------------------------------------------------------

December 24, 1980

FILED

DEC 24 1980

Thomas J. K_____

CLERK OF SUPREME COURT,
STATE OF MONTANA

Mr. Justice Daniel J. Shea concurring in part and dissenting in part:

I concur with the decision reversing and dismissing the obscenity conviction, but I have more to say on the issue of contemporary community standards. Even without a statute requiring evidence of contemporary standards, we should require such evidence in all obscenity trials so that a jury is not given unbridled discretion to determine what is or is not obscene. Requiring evidence of contemporary community standards also preserves our function as a reviewing court so that we do not become merely a rubber stamp for what has occurred at trial. My views are set forth in this opinion.

I also concur with the decision vacating the sentence and remanding for a new sentencing hearing. I depart here from the majority, however, because I would not permit the State to introduce evidence at the new sentencing hearing, that the defendant, so many years ago, had sexual contact with two young girls, now grown women. The offered testimony is too remote and impossible to defend against. Furthermore, the State should not be rewarded here for taking unfair advantage of the defendant at the first sentencing hearing. I emphasize, however, that because I dissent from the affirmance of the assault convictions, the sentencing issue here would be moot unless defendant were again convicted after a new trial. My views as to sentencing are set forth in this opinion.

I dissent from the opinion affirming the assault convictions, for the basic reason that we have no assurance that the trial court properly decided the underlying "without consent" element of the charge by applying the right law. The assault convictions present a simple issue (complicated, however, by the majority decision): Should we

-16-

affirm a conviction and send a person to prison where there is no assurance, and therefore more than a reasonable doubt, that the trial court applied the right law in deciding the "without consent" issue, an essential element of sexual assault?  To this question the majority declares "yes."  I say that the answer must be "no."

I proceed first to the assault convictions.

## THE ASSAULT CONVICTIONS

### Procedural Background and Problems Presented

As I stated in the introduction, a simple problem is presented here, and it is only made more complicated by the majority opinion.  The question centers around whether the trial court decided the "without consent" issue by application of the right law.  No one knows.  Because we do not know, I say that if we are going to send a man to prison, we should first be sure of what the trial court actually decided.  The essence of the majority opinion is that it really doesn't matter what the trial court actually decided--we can tell from the evidence that the defendant is guilty.  The question presented is not what the evidence shows as to the consent issue--the question is what the trial court decided as to the consent issue.  Because it is impossible to make this determination from the record here, I believe that the assault convictions must be reversed.

The problems presented can best be understood in the procedural context of how the consent issue arose--the question at trial arose as to what law should apply to the facts to determine the question of consent.  At the end of the State's case, defendant moved to dismiss the charges because the State failed to prove lack of consent.  It appears that the State was at all times proceeding under an assumption that "without consent" was proved as a matter of

law simply by proving the age of the defendant (65) and the age of the boy (10)--the State taking the position that the boy was legally incapable of consenting to the sexual contact. The State did prove the defendant's age and the boy's age.

In response to the defendant's motion to dismiss, the State was apparently taken by surprise, and thus moved the trial court to offer additional evidence on the consent issue. This request was taken under advisement and later denied. Both sides then submitted briefs on the consent issue. The State argued that not only was lack of actual consent proved by the evidence, but that in any event the boy was legally incapable of consenting because of his age. The State urged two incapacity to consent theories upon the trial judge: First, that the statutes providing that one under the age of 16 is incapable of consenting to an act of sexual intercourse (see sections 45-5-501 and 45-5-503), and that the same statutes applied to the sexual assault statute, section 45-5-502. Second, the State argued that case law justified application of the common law rule that someone of this boy's age is precluded from giving his legal consent to anything.

The trial court later entered its findings of fact and conclusions of law, and found the defendant guilty. The majority opinion sets forth the pertinent findings and conclusions as to both assault convictions. Defendant then appealed to this Court.

In defendant's opening brief to this Court, he effectively foreclosed any reliance by the State on either theory of legal incapacity to consent. The State recognized this in its reply brief by conceding that neither theory of legal incapacity to consent was the right law to apply to this

case. Thus, the State confined its agument to whether there was sufficient evidence in the record to support a determination that the boy did not in fact consent to the sexual contact. The State ignored the obvious issue pulled into focus by its concession that neither legal incapacity to consent theory could apply here: Assuming there is sufficient circumstantial evidence to justify findings and conclusions that the boy did not consent, how do we know that the trial judge actually decided the consent issue on this basis unless he told us so in his findings and conclusions? He did not. In fact, it is impossible to tell from the findings and conclusions just what theory of consent the trial court applied in finding and concluding that "without consent" was proved. We are left to guess.

Even the majority opinion acknowledges that it is impossible to tell from the findings and conclusions which theory of consent the trial court applied to the consent issue:

> ". . . Assuming that the evidence is
> sufficient (and we so find), we are con-
> fronted with a bare bones set of findings and
> conclusions, from which it is not apparent
> the precise legal basis upon which the trial
> court decided the issue of consent . . ."

The majority also accurately defines the problems created by the "bare bones" findings and conclusions when presented to an appellate court:

> "Our task here, however, does not end with a
> holding that the evidence is sufficient for
> sustaining a finding of guilt. We are left
> with a sufficient evidentiary record and with
> no precise basis of determining how the trial
> court reached its decision.
>
> ". . .
>
> "In this appeal, the State concedes the
> inapplicability of either of its arguments
> with relation to inability to consent as a
> matter of law. The State thus concentrates
> on its first approach: which is that cir-
> cumstantial evidence existing is sufficient

to prove the lack of consent. We agree with this assessment. However, the findings and conclusions entered by the trial court do not tell us on what legal basis the trial court determined the issue of consent. Did the trial court determine as a matter of evidence only that the State had proved lack of consent? Or did the trial court determine that the young boy was, as a matter of law, incapable of giving consent by either of the two theories advanced by the State?"

Unfortunately, before deciding to affirm the convictions here, the majority does not purport to answer these questions. Why are we affirming the convictions and sending this man to prison if we do not know the answers to these questions? How can we in good conscience put our stamp of approval upon these convictions when we do not know the answers to these questions?

In fact, if anything at all is to be gleaned from the pertinent findings and conclusions quoted in the majority opinion, it is that it is just as likely as not that the trial judge decided the consent issue based on the boy's legal incapacity to consent--the wrong law. At trial, the State proved both the age of the defendant (65) and the age of the boy (10). Before the trial judge entered the findings and conclusions, the State urged him to use one or the other of the legal incapacity to consent theories. In each of the pertinent findings, the trial judge recites the age of the defendant (65) and the age of the boy (10), and repeats this in each of the pertinent conclusions of law. It is from these underlying findings and conclusions that the trial judge found the defendant guilty under section 45-5-502, supra, the sexual assault statute. In any event, it cannot be stated beyond a reasonable doubt, that the trial judge applied the right law.

In cases that present problems such as this, there is a well-known and often-used rule that appellate courts apply

-20-

in deciding what must be done with the judgment under review. Invocation and application of that rule here would require this Court to reverse the assault convictions. Unfortunately in this case, we ignored this rule.

The Majority Ignored a Fundamental Rule of Appellate Review

The rule I refer to is a simple one: a judgment must be set aside where it is supportable on one ground but not another, if it is impossible to determine which ground was used in reaching the decision. This rule applies to jury-tried cases and to judge-tried cases. It is basic, hornbook law.

The U.S. Supreme Court has applied this rule in jury cases and judge-tried cases. Yates v. United States (1957), 354 U.S. 293, 77 S.Ct. 1064, 1073, 1 L.Ed.2d 1356 (a jury case); and Thomas v. Collins (1945), 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (a judge-tried case). In Yates, a judge instructed a jury on a criminal charge in which the statute of limitations had expired as to part of the charge, but in which the other part of the charge was still valid. The jury returned a guilty verdict, but the U.S. Supreme Court ultimately reversed the conviction because it could not determine whether the jury convicted on the part of the charge in which the underlying statute of limitations had expired, or on that part of the charge that was still valid. In remanding for a new trial on that part of the charge still valid, the Supreme Court held:

> ". . . In these circumstances we think the proper rule to be applied is that which requires a verdict to be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to determine which ground the jury selected. Stromberg v. People v. California, 283 U.S. 359, 367-368, 51 S.Ct. 532, 535, 75 L.Ed. 1117; Williams v. State v. North Carolina, 317 U.S. 287, 291-292, 63 S.Ct. 207, 209-210, 87 L.Ed. 279; Cramer v. United States, 325 U.S. 1, 36, 65 S.Ct. 918, 935,

-21-

note 45, 89 L.Ed. 1441." 354 U.S. at 312, 77 S.Ct. at 1073, 1 L.Ed.2d at 1371.

In Thomas v. Collins, supra, the U.S. Supreme Court applied the same rule in reversing a civil contempt order approved by the Texas Supreme Court. A Texas trial trial judge had issued an order to union organizers that imposed restraints on their organizing activities. The trial court held a union member in contempt of court for violating its order. The Texas Supreme Court affirmed the order. One of the issues presented to the U.S. Supreme Court, was whether, in making the speech for which he was held in contempt, the union member had uttered general statements inviting people to join the union, or whether he had uttered statements addressed to specific people inviting them to join the union. The trial court order was not clear as to which activity resulted in the citation for contempt. The problem presented by the ambiguous order of the trial court, was stated as follows:

> ". . . The order adjudging Thomas in contempt was in general terms, finding that he had violated the restraining order, without distinction between the solicitations set forth in the petition and proved as violations . . . In this state of the record it must be taken that the order followed the prayer of the motion [the motion to have the court hold Thomas in contempt for his utterances in violation of a court order] and the fiat's recital, and that the penalty was imposed on account of both invitations. The judgment therefore must be affirmed as to both or as to neither. Cf. Williams v. North Carolina, 317 U.S. 287, 292; Stromberg v. California, 283 U.S. 359, 368, and it follows that the statute, as it was applied, restrained and punished Thomas for uttering, in the course of his address, the general as well as the specific invitation." 323 U.S. at 529. (Emphasis added.)

The Supreme Court reversed the judgment, holding that it could not affirm the contempt citation on both grounds.

By application of this rule to judge-tried cases, the U.S. Supreme Court issued a clear message to all trial

-22-

courts that the legal basis for a decision must be clearly ascertainable, at least all judgments that contain constitutional issues--free speech being the issue in Thomas v. Collins.

Although it was ignored in this case, this rule is no stranger to this Court. We have invoked the rule in both civil and criminal cases to reverse district court judgments in situations in which right and wrong instructions are given to a jury, but where it is impossible to tell whether the jury relied on the right instructions or on the wrong instructions. Civil cases include: Wolf v. Barry O'Leary, Inc. (1958), 132 Mont. 468, 318 P.2d 582, 586; Kirk v. Smith (1914), 48 Mont. 489, 138 P. 1088, 1089. Criminal cases include: State v. Garney (1949), 122 Mont. 491, 207 P.2d 506; State v. Jones (1914), 48 Mont. 505, 139 P. 441; State v. Keerl (1904), 29 Mont. 508, 75 P. 362, 365; State v. McClennan (1900), 23 Mont. 532, 59 P. 924, 926; State v. Peel (1899), 23 Mont. 358, 59 P. 169, 174; State v. Sloan (1899), 22 Mont. 293, 56 Mont. 264, 268; and State v. Rolla (1898), 21 Mont. 582, 55 P. 523, 525.

The effect of not applying our own rule here is that the defendant has been convicted and sentenced to prison, and yet we do not even know whether the trial court properly decided the "without consent" element of the crime by applying the right law.

Nor is it any excuse to refuse to apply this rule because statutes do not require a judge in a criminal bench trial to enter findings and conclusions of law. In federal selective service cases, even though there were no statutory provisions requiring findings and conclusions by draft boards, federal courts have shown no hesitation in invoking this rule or some version of it in situations where the

basis of the decision cannot be determined. See, for example: U.S. v. Lemmens (7th Cir. 1970), 430 F.2d 619, 624; U.S. v. Broules (4th Cir. 1970), 423 F.2d 1299, 1304; U.S. v. Hauthton (9th Cir. 1969), 413 F.2d 736, 742; U.S. v. Washington (6th Cir. 1968), 392 F.2d 37, 39; and U.S. v. Jakobson (2d Cir. 1963), 325 F.2d 409, 416-417.

I have cited sufficient authority to establish the rule upon which I rely in concluding that the assault convictions must be reversed. I want to leave no doubt that the rule is just what I state it is, basic hornbook law. The rule or some version of the rule is set forth in: 58 Am.Jur.2d New Trial, §§ 125-126; 75 Am.Jur.2d Trial, §§ 628, 920; 23A C.J.S. Criminal Law, § 1307; 24A C.J.S. Criminal Law § 1888(c) and 66 C.J.S. New Trial, § 44.

The U.S. Supreme Court makes abundantly clear in Thomas v. Collins that it will also apply this basic rule to judge-tried cases. Moreover, its application is particularly required in criminal cases. Whether it be a jury trial or a judge-tried case, the potential loss of life or liberty by an application of the wrong law, is the same.

In a jury case, if a judge gives the jury the wrong law to apply to the evidence, that is the fault of the judge, not the jury. In a judge-tried case, if the judge applies the wrong law to the evidence, obviously that is the fault of the judge, not of anyone else. (I cannot discount the fact, however, that overzealous counsel may well contribute to the error of a trial judge.) The only distinction between a jury case and a judge-tried case is that in a jury case, the existence of the jury instructions, including the wrong ones, would make the error more palpable. But the mistake, however palpable it may be in a jury case, is no less grievous to a defendant in a judge-tried case because

the trial judge fails to disclose the grounds upon which he decided the case. It would be a strange doctrine to hold in a criminal case that a trial judge does not have to disclose the legal grounds for conviction. But, if we do permit such procedure, the burden must, on appeal, clearly be placed on the state to prove that the right legal grounds were used for conviction.

Furthermore, if trial judges can, by the expedient of omitting from their decisions (whether intentional or otherwise), the legal basis upon which a conviction is based, it will do more than frustrate the appellate review process. It will effectively immunize trial judge decisions from appellate review. Trial courts will become infallible on questions of law simply by failing to disclose the legal grounds upon which their decisions are based. That is why we must do our duty here and reverse the assault convictions.

I can only explain the failure to apply this basic rule here, and the decision of the majority to affirm, as demonstrating that the Court is more concerned with arriving at the result we want than we are with arriving at the right result. Nonetheless, failure to apply this rule here, still does not mean that our duties of review are fulfilled. The ambiguous findings and conclusions create constitutional problems that we cannot ignore. Failure to apply the basic rule that I urge here, does not cause the constitutional issues to evaporate.

Constitutional Barriers of Winship and Chapman Have Not Been Successfully Crossed

If we applied the rule I urge here, we would not have to meet the underlying constitutional issues created by the ambiguous findings and conclusions entered by the trial

judge. But the rule must sometimes be invoked precisely because there is an underlying constitutional issue. That was, for example, the essential reason for the U.S. Supreme Court invoking and applying the rule in Thomas v. Collins, supra, to reverse the contempt of court citations. Because we did not invoke and apply the rule to reverse, we must, nonetheless, successfully cross two barriers imposed by the United States Supreme Court.

First, if we do not invoke the rule and reverse, we still must cross the barrier of In Re Winship (1970), 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368, which declares that the Due Process clause of the U.S. Constitution requires the State to prove beyond a reasonable doubt, each element or fact essential to a conviction. 397 U.S. at 364, 90 S.Ct. at 1073, 25 L.Ed.2d at 375. How can we say here that the element of "without consent" was proved beyond a reasonable doubt when in the same breath we must declare that it is impossible to tell whether the trial judge applied the right law in deciding the consent issue?

Second, Chapman v. California (1967), 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 reh. denied 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed.2d 241, declares that when a case infected with constitutional error, comes to an appellate court for review, the judgment can be affirmed only by a declaration of a belief beyond a reasonable doubt, that the error was harmless. 386 U.S. at 24, 87 S.Ct. at 828, 17 L.Ed.2d at 710-711. Applied here, we can declare the ambiguous findings and conclusions harmless only if we can declare beyond a reasonable doubt that the trial judge in fact applied the right law to the consent issue. The majority opinion makes the case for reversal here:

"The conclusions of law reached by the
District Court could be construed to mean

-26-

that the court found lack of the victim's consent from his incapacity as a ten-year old to consent [conceded by the State in its brief to be the wrong basis], or that in any event the boy did not consent . . ."

What more is needed to reverse the judgments?

Assuming proof of the "without consent" issue by application of a legal incapacity to consent theory, it is no proof at all. I cannot for one minute believe that In Re Winship permits proof of an essential element of an offense by application of the wrong legal standard. This being so, the conviction can stand here only if the right legal standard was applied to the consent issue. Here it is impossible to tell whether the right or wrong legal standard was applied to the consent issue. This being so, there is more than a reasonable doubt that the trial judge applied the wrong legal standard to the consent issue--and so the proof cannot fulfill the mandate of In Re Winship.

Furthermore, as I have indicated, Chapman v. California, supra, puts a brake on all appellate courts in reviewing a conviction that comes to them infected with constitutional error. Applied here, this Court must be prepared to state, before affirming the convictions, that the trial court in fact applied the right legal standard in determining the issue of "sexual contact . . . without consent." That declaration cannot be made here, and the majority has admitted that it cannot be made.

A conscientious application of In Re Winship and Chapman v. California, to the issue presented here requires that the assault convictions be reversed.

Upholding the Convictions Adds to the Constitutional Defects Inherent in the Affirmance:

I have stated my case as to why the assault convictions must be reversed. In the usual dissent, I suppose this

-27-

would be sufficient, but because the majority analysis creates new constitutional defects, I feel compelled to embark upon an analysis of their grounds for upholding the convictions.

First, I would preface my analysis with the statement that the majority's affirmance here is a good example of what happens when well-defined and well-settled principles of appellate review are ignored in the desire to uphold a conviction. Here, however, the problems created are of constitutional dimension, and therefore cannot be so lightly ignored.

Second, I preface my analysis with the conclusions I draw from the majority opinion. In determining on the merits, that defendant is in fact guilty of the crime charged, the function of the trial judge to make factual determinations based upon an application of the right law is usurped. A corollary to this is that we have, by determining the facts on the merits, abdicated our position as a court of review and have become both the trier-of-fact and appellate court rolled into one. Finally, by deciding an essential fact on the merits that may not have been decided by the trial court, we have stripped defendant of his constitutional right to have his guilt or innocence determined at the trial.

The majority cites three cases for the ostensible purpose of laying the groundwork for the legal analysis leading to the affirmance. These cases are wholly inapplicable both factually and legally to the fundamental issue raised here.

First, the majority cites State v. Duncan (1979), ____ Mont. ____, 593 P.2d 1026, 36 St.Rep. 748, 753, as holding that a trial judge in a judge-tried criminal case is "under

no statutory duty, except in death penalty cases (section 46-18-306, MCA), to make findings, but merely obliged to enter a general verdict of innocence or guilt." Whatever the holding may be, the defendant does not contend here that the judge had a statutory duty to enter findings and conclusions, nor does he contend that the judge had a statutory duty to enter more than a general verdict of innocence or guilt. In fact, the trial judge entered both findings and conclusions here, but they are described by the majority, as the "bare bones" kind. Furthermore, the contention in Duncan was not that the trial judge applied the wrong law, or may have applied the wrong law in deciding any of the issues. But the contention here, is that the trial judge may have applied the wrong law in deciding the statutory "without consent" element of the charges. The majority can derive no support from Duncan.

Second, the majority cites State v. Boe (1963), 143 Mont. 141, 388 P.2d 372, for the abstractly vacuous rule that "error of the District Court is not presumed." Translated, this rule means that a party appealing a case to this Court must convince at least a majority of its members that the trial court erred and that the error adversely affected or could have adversely affected the judgment. It obviously would not be a sound rule of judicial administration to require the winning party in District Court to have the initial burden of convincing this Court that the judgment should be upheld. Rather, the initial burden should be placed on the losing party. I note, furthermore, that the majority has not demonstrated application of Boe to resolution of the issue presented here. Finally, however, the fact is that the defendant here has clearly demonstrated prejudicial error committed by the trial judge. The trial

-29-

judge has convicted defendant of two felonies and sentenced
him to prison, and yet has not told defendant which law he
applied to resolution of the consent issue. What could be
more prejudicial than that?

Third, the majority cites State v. Stoddard (1966), 147
Mont. 402, 412 P.2d 827, as embodying the rule that "every
presumption is in favor of a judgment of conviction on
appeal if any substantial evidence supports it." (Emphasis
added.) This is merely another way of stating that if
substantial evidence supports a judgment of conviction, the
conviction will be sustained as against a contention that
substantial evidence does not exist. This is not exactly an
edifying rule, to be classified as a legal gem. It does not
mean, however, that a judgment will be sustained even if
there is substantial evidence, if error occurred during the
trial that affects defendant's right to a fair trial.
Applied here, the question is not whether there is
substantial evidence to uphold the conviction on the basis
that the boy did not consent in any event; the question is
whether the trial judge applied the right law in deciding
the question of whether or not there was substantial
evidence. The issue here is not a question of evidence, it
is a question of law.

These three cases, Duncan, Boe, and Stoddard, supra,
fail to provide good window-dressing for the majority
analysis. After citing Duncan, Boe, and Stoddard, supra,
the majority next states the reasons for affirming the
assault convictions:

> "The conclusions of law reached by the
> District Court could be construed to mean
> that the court found lack of the victim's
> consent from his incapacity as a ten-year old
> to consent, or that in any event the boy did
> not consent. Conclusions of law reached by a
> trial court do not enjoy the same level of
> inviolability that findings of fact are

-30-

> accorded on appeal (see e.g., Rule 52(a),
> M.R.Civ.P.) <u>This Court is in at least an
> equal position with the District Court to
> determine the appropriate conclusion of law
> to be reached from the facts found in a case.</u>
> Since we have found that there was sufficient
> evidence adduced to support a conclusion that
> the boy did not in fact consent to defend-
> ant's unlawful acts, all the presumptions are
> in favor of the judgment of conviction, as we
> have shown. We therefore sustain the con-
> viction on the sexual assault counts."
> (Emphasis added.)

If this opinion says what I think it says, translated,

it would read something like this:

> Only one theory of consent is properly
> applicable to this case; but the findings and
> conclusions are so vague that we cannot tell
> which theory of consent the trial judge
> actually applied to a determination of the
> consent issue. It does not matter however,
> which theory he applied to this
> determination, because we have determined
> that the evidence is legally sufficient to
> support the only proper theory of consent.
> This is the conclusion of law that the trial
> judge should have reached--and if he applied
> the law properly he would have decided the
> same as we decide. Because the evidence is
> sufficient to support a finding that the boy
> did not in fact consent, even though we do
> not know that the trial judge made this same
> finding, we will make the appropriate finding
> and conclusion for him and thus uphold the
> convictions. The convictions are therefore
> affirmed.

Even assuming that I am partially inaccurate in my

translation, this holding, particularly in a criminal case,

is astounding. It strikes at the heart of our trial system.

First, the holding usurps the function of the trial

court--it is the trial judge and the trial judge alone, who

has the right to determine if "without consent" was proved.

We have no right to tell the trial court what conclusion to

reach, and we have no right, as we have done here, to reach

that conclusion for the trial court and affirm the

convictions. Second, as a corollary to usurping the

function of the trial court by deciding the fact of "without

consent" for the trial court, we have abdicated our function

of appellate review. We are here to determine if the

evidence is sufficient to justify the trial court's findings. We are not here to make the findings and conclusions for the trial court. Third, as an appellate court, we have effectively granted a directed verdict in a criminal case by not only telling the trial court what conclusions to reach, but by making that determination ourselves. That is constitutionally prohibited.

I wholeheartedly agree with the majority statement that the conclusions of law can be interpreted to mean that the trial judge decided the statutory element of "without consent" by application of the right law or by application of the wrong law. That, of course, is the issue here: which law did he apply? I agree, at least to an extent, that this Court is not hamstrung by the conclusions of law reached by a trial judge when reviewing the case on appeal. This must be qualified by stating that the conclusions of law based on the credibility of witnesses or demeanor of witnesses, must obviously be given more weight than those reached from cold, objective evidentiary facts. It must be further qualified by stating that the rule is not the same in criminal cases as it is in civil cases.

One of our functions in reviewing cases is to determine whether the findings made can lead to the conclusions of law entered. But we have no right to tell a judge in a criminal case, sitting as the trier of guilt or innocence, what findings to make or what conclusions of law to make in the process of reaching the ultimate question of guilt or innocence. That is solely the perogative of the trial judge, just as it would be the sole perogative of a jury in a case tried to a jury. Unfortunately, that is just what we have done here, and that is where I part company with the majority.

A determination by this Court that the evidence is sufficient to support factual determination and ultimate conclusion that the "sexual contact" was "without consent", does not ipso facto permit this Court to affirm the convictions. Such a ruling means only that the defendant is not entitled, as a matter of law, to a reversal and dismissal of the charges. The ruling on the sufficiency of the evidence had the effect of telling the defendant only that he was not entitled to a dismissal. But whether the convictions can be affirmed, even though the evidence is sufficient to prevent a dismissal, is entirely another question.

An affirmance, or a reversal ordering a new trial, depends on the underlying factual determinations and conclusions of law actually made by the trial judge, rather than on the findings and conclusions that this Court feels he should have made. If we can determine from the findings and conclusions that the trial judge actually decided that the boy did not consent, we can affirm the judgment. But we cannot do so, and the majority admits that we cannot do so. To comply with the mandates of In Re Winship and Chapman v. California, supra, an affirmance requires this Court to state a belief beyond a reasonable doubt that (1) the trial judge actually decided by application of the right law, that defendant did not in fact consent, and (2) that the failure to set forth the legal basis for his findings and conclusions was therefore harmless error. That is a declaration I am unwilling to make. I believe that the majority would also be unwilling to make that declaration, if it had properly addressed the underlying constitutional issues presented by the amgibuous findings and conclusions.

Here, however, the majority went a step beyond an

-33-

affirmance of the trial court's judgment. Admitting that the findings and conclusions are ambiguous, the majority simply determines that the evidence supported a certain finding and such being the case, it would enter the appropriate conclusion of law that the defendant did not in fact consent. In doing so, the court trammelled over some fundamental rights.

If we assume that the trial judge applied the wrong law in deciding the consent issue (and there is more than a reasonable doubt to support this assumption), we have no right, in virtually the same breath, to affirm the convictions because the evidence, nonethless, proved actual nonconsent. Proved to whom: to the trial judge, or to us? We are effectively affirming a conviction that first requires a statutory factual determination that the trial court may not have in fact made. Unless we, as an appellate court, as opposed to the trial judge, have the right to determine guilt or innocence, this cannot be.

An axiomatic constitutional principle in all criminal cases is that guilt or innocence must be decided at the trial level by either the jury, or by the judge where a defendant has waived a jury trial. In the case of a jury trial this basic principle inheres in the Sixth Amendment to the U.S. Constitution and in 1972 Mont. Const., Art. II, §§ 24 and 26. Both provisions guarantee that only a jury can decide guilt or innocence. That is why a trial judge presiding over a jury trial has no right, no matter how compelling the evidence, to direct a jury to find a defendant guilty. Although here the defendant waived a jury trial and elected to have a trial judge decide his guilt or innocence, a necessary corollary to these constitutional provisions, is that where a jury trial is waived only the

-34-

trial judge can determine guilt or innocence. In such event, the judge assumes the same role as the jury and he alone has the perogative to decide guilt or innocence. Where is the law that gives this Court the right to usurp that function?

The only way that I can see where this Court would have the right to determine defendant's guilt or innocence, as we have done here, would be if defendant in his waiver of jury trial expressly consented to this Court assuming this function. Such is not the case here--defendant agreed only to have the trial judge, rather than a jury, decide his guilt or innocence.

Based on the foregoing examination of the law, this Court undoubtedly had no right to decide this case by making the following declaration:

> ". . . This Court is in at least an equal position with the District Court to determine the appropriate conclusion of law to be reached from the facts in a case. Since we have found that there was sufficient evidence adduced to support a conclusion that the boy did not in fact consent to the defendant's unlawful acts, all the presumptions are in favor of the judgment of conviction, as we have shown. We therefore sustain the conviction on the sexual assault counts."

This declaration of guilt has usurped the function of the trial judge, abdicated our position as an appellate court, and denied defendant his constitutional right to have the trial judge, by application of the right law, decide his guilt or innocence.

We can, of course, determine if the trial judge, based on the evidence presented, made a conclusion of law that is supportable by the evidence. But we cannot, based on the evidence in the trial record before us on appeal, make the appropriate conclusion of law for the trial court where by doing so we are deciding a fact essential to a valid

conviction. Here, we decided a fact essential to a valid conviction--the statutory element of "without consent." We decided this fact by declaring that--"the boy did not in fact consent"--and yet we do not know whether the trial judge decided this same fact. For all we know the trial judge decided only that the boy was legally incapable of consenting, and thus never reached the question of whether the boy did or did not in fact consent. Whether the boy did or did not in fact consent, is a question solely for the trial judge--to be decided at a new trial.

I would reverse the assault convictions and order a new trial so that defendant is tried by an application of the right law to the issue of consent.

The Obscenity Issue

Although I agree with the majority that the obscenity conviction must be reversed and dismissed, I do not agree with the majority's apparent response to what it considers adverse public criticism. It is not our function to respond to the will of the people or of the press when reaching our decisions. Criticism, whether right or wrong, from whatever source, comes with the job.

But to get to the issue at hand. We must in cases involving potential constitutional questions relating to the First Amendment and similar provisions in our own constitution, preserve our function as a court of review. To do that, we must require, even though a statute may not require it, that the prosecution introduce evidence of contemporary community standards in support of its case-in-chief. If we do not do this, we will have nothing to review in such cases, and each jury will be given the unbridled discretion to reach whatever decision it wants without regard to the evidence of prevailing community standards.

The majority alludes to Kaplan v. California (1973), 413 U.S. 315, 93 S.Ct. 2680, 37 L.Ed.2d 492, and state that this case "seemingly holds that all that is required is for the alleged obscene material to be introduced into evidence and a subsequent jury verdict stamping the material as obscene . . ." The majority then states that Kaplan does not control because a statute, section 45-8-201(a) and (b), MCA, requires that the "material" involved must appeal to the prurient interest in sex as measured by contemporary community standards. The conviction cannot be sustained, the majority concludes, because the State failed to introduce evidence on both of these points. I agree with this conclusion: It would be a travesty to sustain a conviction where the State has so utterly failed to comply with the statute. But there is another problem here, which the majority does not address. The majority states that the statute was enacted to comply with the mandates of the First Amendment.

However, it would appear that Kaplan, supra, no longer requires such an evidentiary basis in the trial record to meet the requirements of the First Amendment. That is the problem. If we assume that Kaplan is the law, the legislature would be free to repeal section 45-8-201 (a) and (b), and by doing so, empower all juries to decide, without an evidentiary basis founded in contemporary community standards, whether or not the material (or act involved), appealed to the prurient interest in sex and deviated from contemporary community standards.

The prospect that the trier of fact, whether it be a judge or a jury, would have unbridled and unreviewable discretion to determine what is or what is not obscene, impelled the California Supreme Court to require evidence of

community standards in any obscenity prosecution.

What the Court said in the case of In Re Giannini (1968), 72 Cal. Rptr. 655, 446 P.2d 535, bears repeating. To assure the integrity of the trial process itself, the Court stated:

> "Relying principally on the well established doctrine that jurors should not be endowed with the prerogative of imposing their own personal standards as the test of criminality of conduct, we hold that expert testimony should be introduced to establish community standards. We cannot assume that jurors in themselves necessarily express or reflect community standards; we must achieve so far as possible the application of an objective, rather than a subjective, determination of community standards. An even-handed application of the criminal law, even with evidentiary guidance . . . is sufficiently difficult in an area so confusing and intricate as obscenity. To sanction convictions without expert evidence of community standards encourages the jury to condemn as obscene such conduct or material as is personally distasteful or offensive to the particular juror. (Cf. United States v. Klaw, supra, 350 F.2d 155, 167.) 'Community standards . . . can . . . hardly be established except through experts . . . There is no external measuring rod for obscenity. Neither, on the other hand, is its ascertainment a merely subjective reflection of the taste or moral outlook of individual jurors or individual judges.. . . Their interpretation ought not to depend solely on the necessarily limited, hit-or-miss subjectible view of that they are believed to be the individual juror or judge. It bears repetition that the determination of obscenity is for juror or judge not on the basis of his personal upbringing or restricted reflection or particular experiences of life, but on the basis of 'contemporary community standards'" Smith v. People v. State of California (1959), 361 U.S. 147, 165, 80 S.Ct. 215, 225, 4 L.Ed.2d 205 (Frankfurter, J., concurring) 446 P.2d at 543-544.

The court in Giannini held, moreover, that there are equally cogent reasons for requiring evidence of community standards in order to facilitate appellate review and to assure that it is more than a rubber-stamping process for what has occurred at the trial level. The Court stated:

"Finally, even if the jury should be deemed to be a metaphysical embodiment of the 'community,' and therefore intrinsically cognizant of community standards, proof of community standards would nevertheless be indispensable to effective appellate review. An appellate court must reach an independent decision as to the obscenity of the material . . . Since an appellate court certainly does not in any sense compose a cross-section of the community, it cannot effectively carry out this function in the absence of evidence in the record directed toward proof of the community standard." 446 P.2d at 544.

The Giannini decision has much to commend it. There is no doubt that the United States Supreme Court has vascillated on the issues relating to obscenity and the First Amendment. But whatever the outcome, trial judges or trial jurors, should not, in a federal or state system, be given the sole and unmodifiable prerogative to determine by their own standards, what is or what is not obscene. This rather fundamental observation, as set out in Giannini, should require in all obscenity prosecutions that the prosecution introduce evidence of contemporary community standards as part of its proof. The material itself or the act itself should not be sufficient to establish the sole basis for a prosecution.

The Sentencing Issue

There is a little more to the background of the State springing the other witnesses to previous crimes on the defendant at the sentencing hearing. The State admitted before this Court that it deliberately withheld its evidence from the defendant with the intent to take him by surprise at the sentencing hearing. The question arises as to whether the State should be rewarded by these tactics by giving it the green light to again offer this testimony at the resentencing. I don't think so. To permit the State to again offer this testimony only encourages the State to use questionable trial tactics in its efforts to seek

convictions and stiffer sentences. The only way the State can learn to play fair by starting off initially with fair notice, is by an order precluding the State from again offering this testimony.

In admitting before this Court that it deliberately withheld the evidence from the defendant until the eleventh hour--about five minutes before the sentencing hearing was to begin--the State offered no justification for doing so other than its desire to catch the defendant by surprise. The State admitted that it first learned of the existence of these witnesses several days before the date set for the sentencing hearing. The prosecutor immediately set to work researching the law to find legal support for his decision to take the defendant by surprise by springing this testimony on him at the sentencing hearing. He also researched the law as to the admissibility of such evidence. Upon the commmencement of the hearing, the prosecutor immediately provided the product of his research to the trial court--designed, of course, to influence a favorable decision to admit the testimony of the two women. Defendant received a copy of the State's brief only a few minutes before the opening of the hearing. So defendant had no opportunity to research the law to attempt to influence the trial court not to admit the testimony.

Common sense, or at least a sense of fundamental fairness, should have convinced the prosecutor at the outset that he did not have to research the question of whether he had the duty to give reasonable notice to defendant of the State's intent to use such prejudicial evidence at the sentencing hearing. The prosecutor clearly had the duty to give advance notice to the defendant. That is why I do not see why the State should be rewarded by a decision of this

Court that permits the State to again offer the testimony. If the State does not have to pay the price for its calculated decision to deprive defendant of fair notice, the State will only be encouraged to use the same tactics in the future, safe in the knowledge that this Court will impose no sanctions and that the evidence will ultimately be received in evidence against the defendant.

Even assuming proper notice from the outset, of the State's intent to use this testimony at the sentencing hearing, the combination of lack of corroboration and remoteness in time, rendered the testimony inadmissible. The alleged acts of exposure and genital fondling occurred 10 and 13 years before the sentencing hearing. The witnesses were young girls at the time of the alleged acts and their testimony years later, as could well be expected, was inexact as to dates and times. No criminal charges were filed against defendant as the result of these alleged transgressions. In fact, the record does not show that the girls complained at the time to anyone. At least the State made no attempt to corroborate their testimony by producing witnesses to statements of fresh complaint. Therefore, whether the witnesses complained many years ago to their parents or to anyone else concerning the defendant's/ conduct is anyone's guess.

While incidents occurring many years ago do not automatically immunize a defendant from inquiries into his past for sentencing purposes, the combination of circumstances here--lack of corroboration and remoteness in time--should render the testimony inadmissible. Even assuming that these alleged transgressions could be corroborated by producing witnesses to fresh complaints, the factor of remoteness of time has special significance as to

defendant's ability to defend against such accusations. A person cannot effectively defend against events that have occurred so many years ago. Due process of law does have a place at a sentencing hearing, and here it would prevent the use of such testimony.

A final argument of the State concerning the surprise testimony, deserves comment. The trial judge did not refer to the testimony of the two women either in the record of the sentencing or in the judgment. The State therefore argues that the trial court did not consider this testimony as a factor in his sentencing decision, and that the evidence could not have influenced the sentencing decision. This argument ignores reality. Where evidence of such an inherently prejudicial and inflammatory character is admitted, no appellate court should assume that the trial court paid no attention to it simply because he did not comment on such evidence during the sentencing hearing or in the judgment. If the trial court admitted the evidence, as it did here, it is not unreasonable to assume that the court considered it in reaching the sentencing decision. On appeal, the burden should be placed on the State to prove that the court did not consider the inflammatory evidence in reaching the sentencing judgment. Where the State offers the evidence for the express purposes of moving the sentencing court to impose a more severe sentence, the State should have the burden of proving that the court did not use the evidence in reaching his decision. Once the evidence is admitted, it would not be fair at all to require the defendant to prove that the trial court did consider the evidence. It would impose an impossible burden on him.

The proper disposition of the sentencing issue, is to vacate the sentence, which has been done, but also to order

that at the resentencing, the State cannot again offer the testimony of the two women witnesses to events that occurred so long ago.

THE PLAN TO GET EVIDENCE ON THE DEFENDANT

The Plan to Put the Boy Back in the Swimming Pool with the Defendant

Although it does not bear on the disposition of any issue resolved in this appeal, the plan to put the boy back in the swimming pool with the defendant shows a gross insensitivity to the feelings of the boy.

Law enforcement officers, with the cooperation of the boy's parents and the boy himself, decided to put the boy back in the swimming pool with the defendant so that the defendant could be observed making overtures to the boy. The boy went to the swimming pool for the express purpose of luring the defendant into an incriminating situation. Law enforcement officers, incognito, accompanied the boy to the pool, hoping to observe the defendant's activities and therefore make a tighter case against him. The officers testified that they did not want another sexual contact to take place, but only that they wanted to observe the defendant making friendly overtures to the boy. The events, however, went another step—the disguised law officers waited until defendant actually approached the boy and engaged in sexual contact before they took any action.

Although the boy was in no physical danger (one of the police officers was in the swimming pool), permitting another sexual contact to take place demonstrated a gross insensitivity to the young boy. The record does not show how this may have affected the boy, but even the potential for traumatic effects should have dissuaded the police from permitting another sexual contact. The desire of the police

-43-

officers to obtain more concrete evidence of the defendant's conduct is laudable. But again subjecting the boy to possible emotional trauma by permitting another sexual contact, cannot be condoned, however laudable the objective. The plan may well have helped to chalk up another conviction, but it should not have been undertaken at the boy's expense.

In concluding this dissent, I again reiterate that we have trampled on some pretty fundamental law in affirming the assault convictions. That law does not change because of the nature of the case that is before us for review.

Daniel J. Shea